UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------X
KAMILA OSEKAVAGE,

                            Plaintiff,

v.

SAM'S EAST, INC., et al.,

                            Defendants.
--------------------------------------------------------X

**MEMORANDUM OPINION
AND ORDER**

19-CV-11778 (PMH)

PHILIP M. HALPERN, United States District Judge:

       Kamila Osekavage ("Plaintiff") brings this action under Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e *et seq*. and New York Human Rights Law ("NYSHRL"), N.Y. Exec. Law § 296 *et seq*., alleging that Sam's East, Inc. ("Sam's"), Walmart, Inc. ("Walmart") and Stephen Orloski ("Orloski," and collectively, "Defendants") unlawfully terminated Plaintiff's employment on the basis of her sex and in retaliation for her engaging in protected activity.

       Presently pending before the Court is Defendants' motion for summary judgment seeking dismissal of Plaintiff's claims under Federal Rule of Civil Procedure 56. (Doc. 56; Doc. 57, "Defs. Br."; Doc. 58; Doc. 59; Doc. 60). Plaintiff opposed Defendants' motion (Doc. 64, "Pl. Br."; Doc. 65, "Pl. Decl."; Doc. 66; Doc. 67) and the motion was fully submitted with the filing of the motion, opposition, and Defendants' reply brief on December 15, 2021 (Doc. 63, "Reply").

       For the reasons set forth below, Defendants' motion is DENIED.

## BACKGROUND

       The facts recited below are taken from Plaintiff's Complaint (Doc. 1, "Compl."), the single document representing Defendants' Local Civil Rule 56.1 Statement with Plaintiff's responses and

Counterstatement of additional material facts,[1] and the admissible evidence submitted by the parties.

## I.    Plaintiff's Employment Background

Plaintiff began her employment with Sam's in the Secaucus, New Jersey store—known as a "Club"—as a Café Associate in or about August or September 2004. (Compl. ¶ 15; Doc. 12, "Ans." ¶ 15). Plaintiff was thereafter promoted to Marketing Team Leader and later, in or about October or November 2006, promoted to a Management Trainee position. (Compl. ¶ 17; Ans. ¶ 17). From 2007 to 2014, Plaintiff held various Assistant Manager positions at Sam's in Edison, New Jersey, reporting to Club Manager Rocco Capuano ("Capuano"). (Compl. ¶ 18; Ans. ¶ 18; Pl. Tr. 54:6-18).[2] In 2014, Orloski, as Market Manager, promoted Plaintiff to the position of co-manager of the Secaucus Club, where she initially reported to Club Manager John Donnelly

---

[1] Plaintiff combined her Rule 56.1(b) response and her eighty-seven paragraph "Counterstatement" of additional material facts into one document. (Doc. 66). For the sake of clarity, the Court notes that Plaintiff responded "admit" to thirty-one of the thirty-eight Statements of Undisputed Material Facts in Defendants' Rule 56.1(a) Statement. Plaintiff then began her "Counterstatement," setting forth additional material facts in numbered paragraphs beginning again at number one. The Court hereafter refers to the first section of the document as "56.1 Stmt." (Doc. 66 at 1-11) and the second section as "Pl.'s CntrStmt." (*id.* at 11-23). Defendants did not respond to the additional facts set forth in Plaintiff's Counterstatement. The Court could arguably deem these facts admitted by Defendants. *See* Rule 56.1(c) ("Each numbered paragraph in the statement of material facts set forth in the statement required to be served by the moving party will be deemed to be admitted for purposes of the motion unless specifically controverted by a correspondingly numbered paragraph in the statement required to be served by the opposing party."). However, "[a] district court has broad discretion to determine whether to overlook a party's failure to comply with local court rules." *Holtz v. Rockefeller & Co.*, 258 F. 3d 62, 73 (2d. Cir. 2001). The Court may conduct its own review of the record to determine what facts, if any, it considers to be undisputed or uncontroverted by admissible evidence. *GEICO Marine Ins. Co. v. Mandel*, No. 19-CV-03107, 2020 WL 6318948, at *2 (E.D.N.Y. Sept. 18, 2020), *adopted by* 2020 WL 5939186 (E.D.N.Y. Oct. 7, 2020); *see also Pensionsversicherungsanstalt v. Greenblatt*, 556 Fed. App'x 23, 25 (2d Cir. 2014) (noting that "nothing requires a district court to deem evidence admitted, or grant summary judgment, simply because a non-movant fails to comply with local rules such as Local Rule 56.1").

[2] Defendants combined all deposition transcripts into one document separated by exhibit numbers. (Doc. 61). The Court hereafter refers to each exhibit as follows: Exhibit 1 as "Pl. Tr." (Doc. 61 at 3-301); Exhibit 2 as "Clark Tr." (*id.* at 303-688); Exhibit 3 as "Orloski Tr." (*id.* at 690-1070); Exhibit 4 as "Budrow Tr." (*id.* at 1072-1330); Exhibit 5 as "Stein Tr." (*id.* at 1332-1483); Exhibit 6 as "Evans Tr." (*id.* at 1485-1533); Exhibit 7 as "Angulo Tr." (*id.* at 1535-1605); Exhibit 8 as "Donnelly Tr." (*id.* at 1607-1661); Exhibit 9 as "Button Tr." (*id.* at 1663-1786); and Exhibit 10 as "Keating Tr." (*id.* at 1788-1929).

("Donnelly") and then to Donnelly's replacement, Salvatore Salemi. (56.1 Stmt. ¶ 1; Pl. Tr. at 61:12-24).

Plaintiff alleges that throughout her years as a co-manager in the Secaucus Club, she observed Orloski's interactions with his subordinates and determined that Orloski treated his male subordinates more favorably than his female subordinates, including Plaintiff. (Pl. Decl. ¶ 4). Plaintiff contends that Orloski would speak to female subordinates in a hostile and intimidating manner, which was different from his more jovial and less demanding interactions with male subordinates. (*Id.*). Plaintiff maintains that while she served as a co-manager, she expressed her interest in a promotion to a Club Manager position in the New Jersey or Eastern Pennyslvania geographic area, but Orloski allegedly remarked that if Plaintiff became a Club Manager, her husband would likely divorce her. (Pl. Decl. ¶ 5). Orloski promoted Plaintiff to the position of Club Manager of the Fishkill, New York Club on April 1, 2017. (56.1 Stmt. ¶ 2). Orloski was the Market Manager responsible for overseeing the Fishkill Club, and the several other Clubs which made up Market 15. (*Id.*; Orloski Tr. 35:2-36:17).

II.   Sam's Club Manager Role and Club Standards

As a Club Manager, Plaintiff was responsible for the Club's operation, with the attendant duties of providing direction, guidance, and supervision to other members of club management and hourly associates. (56.1 Stmt. ¶ 3; *see also* Doc. 60, "Wyatt Decl.," Ex. 4). Fundamentally, Club Managers are tasked with increasing the quality of members' experience by ensuring appropriate service levels and effective merchandise presentation, including proper signage and maintenance of stock and inventory levels. (56.1 Stmt. ¶ 3). Club Managers are also responsible for the development and implementation of action plans to improve performance; providing direction and guidance on executing Company programs and strategic initiatives; ensuring that all

areas of the club are in compliance with Company policies and procedures; and communicating with management and associates about Facility operations, merchandising, and Company direction. (*Id.*).

Sam's promulgated a set of Club standards in 2017 called the "First Five." (56.1 Stmt. ¶ 4; *see also* Clark Tr. at 108:13-113:11). These standards required that Clubs be "clean, neat, and straight," with retail areas and the exterior of the Club kept free of trash and debris and the stocked retail areas well-organized. (56.1 Stmt. ¶ 4). Sam's management also expected that Club aisles and merchandise pallets would be organized in a "crisp," "laser"-like manner. (56.1 Stmt. ¶ 5; *see also* Clark Tr. at 89:22-23). Sam's also maintained a comprehensive Disciplinary Action policy that provided for first, second, and third written disciplinary actions within a twelve-month period before termination. (56.1 Stmt. ¶ 6; *see also* at Pl. Tr. at 164:12-20).

III.  June 2018 Tours and Disciplinary Actions for Market 15 Club Managers

On June 6, 2018, Sam's Vice President Cedric Clark ("Clark"), along with other regional personnel, toured the Fishkill Club with Plaintiff, offering Plaintiff notes on opportunities to improve the Club, including plans to ensure that the Club was "crisp" with aisle and retail items maintained in a tidy manner. (56.1 Stmt. ¶ 8; *see also* Clark Tr. at 203:17-204:17). Clark expected Plaintiff to execute the improvements identified on the tour. (56.1 Stmt. ¶ 8; *see also* Clark Tr. at 89:7-90:16). Clark perceived Plaintiff to have reacted to his feedback by offering excuses, whereas Plaintiff believed her responses demonstrated that she was working diligently to address issues. (56.1 Stmt. ¶ 9; Clark Tr. at 186:10-17; Pl. Decl. ¶ 13). Clark returned to the Fishkill Club three days later, on June 9, 2018, finding that at least one of the opportunities he identified on June 6th had not been addressed and identifying other opportunities for improvement. (56.1 Stmt. ¶ 11; *see also* Clark Tr. at 203:20-204:3). Orloski toured the Fishkill Club days later, on June 14, 2018, and,

on June 15, 2018, issued Plaintiff a first written disciplinary action for job performance. (56.1 Stmt. ¶ 16).

Until June 2018, Plaintiff had received only three minor written coachings[3] during her entire career at Sam's, issued in September 2007, June 2009, and October 2010, respectively. (Pl. CtrStmt. ¶ 8; Doc. 67, "Goldman Decl.," Ex. 2). Plaintiff, prior to the June 2018 written disciplinary action, had no official coachings in her personnel file. (*Id.*; Goldman Decl., Ex. 1).

Separately, on June 10, 2018, following a tour of the Elmsford Club, Orloski issued Donnelly a first written disciplinary action for his job performance. (56.1 Stmt. ¶ 14; *see also* Donnelly Tr. at 19:10-13; 20:13-16; Wyatt Decl., Ex. 27). Donnelly agreed with the feedback Orloski provided in the first written disciplinary action. (56.1 Stmt. ¶ 15). Over the next month or two, Orloski toured Donnelly's Club on a weekly basis. (Orloski Tr. at 167:6-18; Donnelly Tr. 27:2-9). Orloski's recollection was that Donnelly had a "tremendous impact" and that "[h]e turned things around very well." (Orloski Tr. at 167:6-15).

On June 28, 2018, Orloski issued Middletown, New York Club Manager Cesar Angulo ("Angulo") a first written disciplinary action for job performance. (56.1 Stmt. ¶ 18; Angulo Tr. at 20:9-21:15). Angulo was receptive to the feedback in the first written disciplinary action, viewing it as helpful to his development as a manager. (56.1 Stmt. ¶ 19; *see also* Angulo Tr. at 24:6-12; 28:4-29:2). Orloski visited the Middletown Club almost every week, sometimes twice per week, between June and November 2018. (Angulo Tr. at 29:7-30:11; 35:10-25). Angulo did not receive another written disciplinary action between June and November of 2018 but did receive feedback from Orloski during that timeframe. (56.1 Stmt. ¶ 19; *see also* Angulo Tr. at 38:4-43:8).

---

[3] The parties refer to "coachings" interchangeably with terms such as discipline or counseling. The Court adopts the nomenclature used by the parties despite lacking a clear definition.

Orloski returned to the Fishkill Club on June 22, 2018, one week after the issuance of Plaintiff's first written disciplinary action, and on June 23, 2018, issued Plaintiff a second written warning for job performance. (56.1 Stmt. ¶ 17). The second write-up indicated that Plaintiff failed to direct her staff to clean out a lock up cage, a task required by management—though Plaintiff maintains that she had directed her staff to do so. (Pl. Decl. ¶ 8; Pl. Tr. at 186:13-187:5). On a conference call held on June 25, 2018, Orloski remarked that there was an issue with management's compliance with the lock up cage directive. Plaintiff believes that multiple Clubs had not completed the task, but no Club Manager other than herself was disciplined or written up for it. (Orloski Tr. at 199:5-200:8; Pl. Decl. ¶ 8).

IV.    Plaintiff's First Ethics Complaint

After Orloski issued Plaintiff a second write-up, on June 25, 2018 Plaintiff emailed Clark stating her belief that Orloski did not "treat male and female [Club Managers] equally." (56.1 Stmt. ¶ 21; Wyatt Decl., Ex 8). Plaintiff's complaint was assigned for investigation to Sam's Field People Partner for Associate Relations in the Northeast Region, Toni Budrow ("Budrow"). (56.1 Stmt. ¶ 21). Between June 27 and August 3, 2018, Budrow investigated Plaintiff's complaint, soliciting feedback from, *inter alios*, Orloski. (*Id.*). On August 2, 2018, Budrow submitted her investigation report to U.S. Ethics Manager Fashia Cizerle, who reviewed the details and concluded that Plaintiff's claims were not substantiated. (*Id.*).

V.    August 2018 Tours

Four days after the investigation of Plaintiff's first ethics complaint was closed, on August 7, 2018, Orloski toured Plaintiff's Club, providing her notes regarding merchandise placement, Club appearance, and a directive to tour the Club for maintenance issues. (56.1 Stmt. ¶ 22). Plaintiff believed that during the tour, Orloski "belittled [her] and tried to discredit [her] in front

6

of [other employees]." (Pl. Decl. ¶ 9). Plaintiff asked Orloski to meet privately in her office to discuss that behavior. (*Id.*). Plaintiff asked Orloski why he had been treating her this way and whether they could move on. (*Id.*). Orloski responded, in sum and substance, "[m]aybe you should stop pursuing conspiracy theories and just do your job." (*Id.*). Following that tour, Orloski emailed Plaintiff on August 8, 2018 with the subject line "Mentorship," asking if Plaintiff would like another Club Manager, such as Capuano, to spend a week at her club, and expressing optimism that it would give plaintiff another frame of reference and some pointers. (56.1 Stmt. ¶ 22). Plaintiff expressed an interest in Capuano's mentorship, so Orloski arranged for Capuano to connect with Plaintiff. (*Id.*).

Orloski toured Plaintiff's Club again on August 16, 2018, and later reported to Clark that he found the Club to be, among other things, "well zoned," "full," and that "standards were good." (56.1 Stmt. ¶ 24). Orloski also reported, however, that notes from his August 7, 2018 tour were incomplete and that other aspects of the Club he instructed Plaintiff to remedy were still lacking. (*Id.*).

VI.   Plaintiff's Third Written Warning and Second Ethics Complaint

On August 20, 2018, after speaking with Clark about further disciplinary action, Orloski asked Plaintiff to meet him in his office to discuss her performance, which Plaintiff took as an indication that Orloski would be issuing her a third write-up. (56.1 Stmt. ¶ 25; Pl. Decl. ¶ 10). Plaintiff lodged a second ethics complaint later that day, alleging that the anticipated formal coaching would be made in retaliation for her prior ethics complaint, and asked: "What should I do next to not get fired by [Orloski] this week?" (56.1 Stmt. ¶ 25). An investigator, Dorothy Button ("Button"), was then assigned to look into Plaintiff's second ethics complaint alleging gender discrimination and retaliation. (*Id.*; Pl. Decl. ¶ 10).

Plaintiff and Orloski met on August 23, 2018, at which time Orloski issued plaintiff a third written disciplinary action for job performance. (56.1 Stmt. ¶ 26; Pl. Decl. ¶ 10). Plaintiff, in response to the write-up, recorded an "Action Plan." (56.1 Stmt. ¶ 27). Button, meanwhile, continued her investigation into Plaintiff's second ethics complaint, which included reviewing market associate demographic information and transfer and coaching records for the Club Managers in Plaintiff's market, as well as interviews with Plaintiff, Orloski, Budrow, a number of current and former Market 15 Club Managers, and three members of Plaintiff's management team. (56.1 Stmt. ¶ 28). Button's investigation concluded on October 17, 2018; Plaintiff's claims were, again, found unsubstantiated. (56.1 Stmt. ¶ 28).

VII.   <u>November 2018 Tours</u>

Orloski returned to Plaintiff's Club on November 1, 2018 and November 3, 2018. (56.1 Stmt. ¶¶ 30, 32). During his November 1, 2018 tour, Orloski observed that, unlike every other Club in the market, Plaintiff did not follow a directive issued in early October to extend the "run" of pallets of merchandise and hang signs with a red star, that more than seventy signs were missing from the sales floor, a truckload of merchandise was left out on the sales floor, the Club had not been stocked with at least thirty "hot" new items, and the Club was congested, dirty, and disorganized. (56.1 Stmt. ¶ 30). Plaintiff emailed Orloski on November 2, 2018 to tell him the run extensions had been completed. (56.1 Stmt. ¶ 31). Orloski's November 3, 2018 tour revealed that Plaintiff had not followed directions on the run extensions, observing that, in his view, many areas were poorly stocked or otherwise in disarray. (56.1 Stmt. ¶ 32). Orloski also took photographs of the opportunities for improvement he observed and sent them to Plaintiff via text message on November 3, 2018, and to Clark via email just after midnight on November 4, 2018. (56.1 Stmt. ¶ 33). Clark, after reviewing Orloski's email and attached photos, responded stating, "[t]his is

horrible." (56.1 Stmt. ¶ 36). He determined, after speaking with Orloski, that Plaintiff had difficulty delivering on basic standards, had not shown consistency in her visits, and offered excuses for her deficiencies. (56.1 Stmt. ¶ 36). Clark expressed his expectation that Orloski proceed with Plaintiff's termination. (*Id.*).

Plaintiff, after receiving Orloski's photos of her Club, drove to the Middletown Club managed by Angulo, took photos, and emailed those photos to Orloski and Clark. (56.1 Stmt. ¶ 34). Orloski forwarded Plaintiff's photos of the Middletown Club to Angulo. (56. 1 Stmt. ¶ 37). Orloski later spoke with Angulo who reported, by telephone, that the opportunities depicted in Plaintiff's photos had been corrected. (56. 1 Stmt. ¶ 37; *see also* at Orloski Tr. at 296:10-297:11, Angulo Tr. at 46:12-21). Orloski, within the next month, followed up with a tour of the Middletown Club. (56.1 Stmt. ¶ 37; *see also* Orloski Tr. at 295:13-296:21; Angulo Tr. 54:2-7). Angulo did not receive any write-ups concerning the issues depicted in the photographs. (Angulo Tr. 54:8-11; Orloski Tr. 297:20-25).

Plaintiff was terminated on November 5, 2018 and replaced with a male Club Manager. (56. 1 Stmt. ¶ 38; Compl. ¶ 68; Ans. ¶ 68).

VIII.   Other Female Club Managers

Plaintiff contends that other female Club Managers witnessed and experienced discriminatory treatment by Orloski. (Pl. Br. at 6-11). Melissa Stein ("Stein"), who previously worked in Market 15 as a Club Manager reporting directly to Orloski, was interviewed by Button in connection with ethics complaints lodged against Orloski. (Stein Tr. 17:17-21, 50:10-51:25; Goldman Decl., Ex. 22). When asked if she had ever witnessed or experienced any favoritism by Orloski of males over females, Stein explained:

> I did feel favoritism . . . . He sided a lot with [Donnelly] and that he
> controlled a lot of [Orloski's] thinking… my perception as a female

9

> was that I didn't have as many chances… [Capuano] and [Donnelly]
> were his go tos. There were 3 or 4 women before me that are not
> with the company or demoted. I just wanted an equal shot and didn't
> feel I was afforded that. This is my perception.

(Goldman Decl., Ex. 22; *see also* Stein Tr. at 84:10-87:5). Stein, at her deposition, provided examples of why she perceived Orloski's treatment of women differently from men. (Stein Tr. at 77:8-84:7). She noted that the favoritism she experienced was specific to certain individuals—namely Capuano and Donnelly—but not necessarily tied to gender. (*Id*. at 118:8-120:11).

Joyce Keating ("Keating"), a Market-level Pharmacy Manager, shared an office with Orloski in the Secaucus store in 2018. (Keating Tr. at 12:8-24, 19:22-21:15). At some point without consulting her, Orloski unilaterally gave Keating's spot in the office to a male Club Manager, causing Keating to sit in an area with no phone, which offended her and made her feel unwelcome. (Keating Tr. at 73:22-77:12). Keating visited the Edison Club in late November 2018, and spoke with Assistant Manager Christina Evans ("Evans"). (*Id*. at 26:6-28:12, 48:4-49:19). Keating recounted that Evans suggested that Orloski treated her differently because of her gender, remarking, "you try being the only female in this club." (*Id*. at 34:13-35:5). Keating further recounted that Evans felt Orloski spoke to her differently than the way he spoke to men. (*Id*. at 47:8-21). Evans, at her deposition, denied ever having such a conversation with Keating and denied ever saying that Orloski spoke differently to males and females. (Evans Tr. at 18:17-20:5).

Keating called Budrow to report what Evans had allegedly communicated to her because, as a manager, she believed it was her responsibility to report anything that involved discrimination or harassment. (Keating Tr. at 36:14-39:3). According to Keating, Evans refused to cooperate when Keating tried to encourage her to file an ethics complaint, stating: "It's [Orloski] we are talking about. Nothing will happen." (*Id*. at 39:20-41:7; Goldman Decl., Ex. 23).

Keating thereafter called Budrow, who responded that she would "take it from here." (Keating Tr. at 42:16-43:5). Keating's report led to a formal ethics investigation of Orloski, conducted by Laura Brewster Nelson ("Nelson"). (Goldman Decl., Exs. 24, 25). Keating, in response to Nelson's interview questions in connection with the investigation, noted that Orloski treats women differently from men and provided examples. (*Id*., Ex. 25; Keating Tr. at 50:3-51:4; 82:6-86:22). By email dated January 28, 2019, Keating elaborated on the issue, stating: "It seems like there is a double set of standards. If two managers - one female-one male - have the same set of issues-standards, compliance, etc., it appears there is more leniency for one than the other." (Goldman Decl., Ex. 26; Keating Tr. at 101:22-109:4).

This litigation followed.

## STANDARD OF REVIEW

Pursuant to Federal Rule of Civil Procedure 56, a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed R. Civ. P. 56(a). "A fact is 'material' if it 'might affect the outcome of the suit under the governing law,' and is genuinely in dispute 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Liverpool v. Davis*, No. 17-CV-3875, 2020 WL 917294, at *4 (S.D.N.Y. Feb. 26, 2020) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). "'Factual disputes that are irrelevant or unnecessary' are not material and thus cannot preclude summary judgment." *Sood v. Rampersaud*, No. 12-CV-5486, 2013 WL 1681261, at *1 (S.D.N.Y. Apr. 17, 2013) (quoting *Anderson*, 477 U.S. at 248). The Court's duty, when determining whether summary judgment is appropriate, is "not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried." *Id.* (quoting *Wilson v. Nw. Mut. Ins. Co.*, 625 F.3d 54, 60 (2d Cir. 2010)). Indeed, the Court's function is not

to determine the truth or weigh the evidence. The task is material issue spotting, not material issue determining. Therefore, "where there is an absence of sufficient proof as to one essential element of a claim, any factual disputes with respect to other elements of the claim are immaterial." *Bellotto v. Cty. of Orange*, 248 F. App'x 232, 234 (2d Cir. 2007) (quoting *Salahuddin v. Goord*, 467 F.3d 263, 281 (2d Cir. 2006)).

"It is the movant's burden to show that no genuine factual dispute exists." *Vermont Teddy Bear Co. v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004) (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970)). The Court must "resolve all ambiguities and draw all reasonable inferences in the non-movant's favor." *Id.* (citing *Giannullo v. City of N.Y.*, 322 F.3d 139, 140 (2d Cir. 2003)). Once the movant has met its burden, the non-movant "must come forward with specific facts showing that there is a genuine issue for trial." *Liverpool*, 2020 WL 917294, at * 4 (quoting *Matsushita Elec. Indus. Co.* v. *Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)). The non-movant cannot defeat a summary judgment motion by relying on "mere speculation or conjecture as to the true nature of the facts." *Id.* (quoting *Knight* v. *U.S. Fire Ins. Co.*, 804 F.2d 9, 12 (2d Cir. 1986)). However, if "there is any evidence from which a reasonable inference could be drawn in favor of the opposing party on the issue on which summary judgment is sought, summary judgment is improper." *Sood*, 2013 WL 1681261, at *2 (citing *Sec. Ins. Co. of Hartford v. Old Dominion Freight Line Inc.*, 391 F.3d 77, 83 (2d Cir. 2004)).

Should there be no genuine issue of material fact, the movant must also establish its entitlement to judgment as a matter of law. *See Glover v. Austin*, 289 F. App'x 430, 431 (2d Cir. 2008) ("Summary judgment is appropriate if, but only if, there are no genuine issues of material fact supporting an essential element of the plaintiffs' claim for relief."); *Pimentel v. City of New York*, 74 F. App'x 146, 148 (2d Cir. 2003) (holding that because plaintiff "failed to

raise an issue of material fact with respect to an essential element of her[] claim, the District Court properly granted summary judgment dismissing that claim"). Simply put, the movant must separately establish that the law favors the judgment sought.

"Courts have acknowledged the dangers of summary judgment in discrimination cases: 'Because direct evidence of . . . discriminatory intent will rarely be found, affidavits and depositions must be carefully scrutinized for circumstantial proof which, if believed, would show discrimination.'" *Benson v. Fam. Dollar Stores, Inc.*, No. 12-CV-01457, 2017 WL 11576213, at *3 (N.D.N.Y. Mar. 31, 2017) (quoting *Schwapp v. Town of Avon*, 118 F.3d 106, 110 (2d Cir. 1997) (citations and internal quotation marks omitted)), *aff'd sub nom. Benson v. Fam. Dollar Operations, Inc.*, 755 F. App'x 52 (2d Cir. 2018).

## ANALYSIS

Plaintiff asserts four claims for relief sounding in discrimination on the basis of her sex and retaliation under Title VII and NYSHRL. The arguments advanced by Defendants concerning each claim are analyzed *seriatim*.

### I.   Title VII: Sex Discrimination

Plaintiff presses a Title VII claim against Sam's and Walmart, alleging that she suffered adverse employment actions on the basis of her sex. "Claims of discrimination under Title VII are analyzed at the summary judgment stage under the burden-shifting test announced by *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)." *Howard v. City of New York*, 302 F. Supp. 2d 256, 260 (S.D.N.Y. 2004), *aff'd*, 363 F. App'x 805 (2d Cir. 2010). Phase one of the *McDonnell Douglas* test places upon the plaintiff the burden of establishing a *prima facie* case of discrimination by alleging that: "(1) [s]he is a member of a protected class; (2) [her] job performance was satisfactory; (3) [s]he was subject to an adverse employment action; [and] (4) the adverse

employment action occurred under circumstances giving rise to an inference of discrimination based on [sex]." *Woods v. Ruffino*, 8 F. App'x 41, 42 (2d Cir. 2001) (citing *McDonnell Douglas*, 411 U.S. at 802).

If the plaintiff sets forth a *prima facie* case of discrimination, "the burden of production then shifts to the defendant to offer a legitimate, non-discriminatory rationale for the adverse employment action." *Wesley-Dickson v. Warwick Valley Cent. Sch. Dist.*, 973 F. Supp. 2d 386, 397 (S.D.N.Y. 2013), *aff'd*, 586 F. App'x 739 (2d Cir. 2014) (quoting *McDonnell Douglas*, 411 U.S. at 802-03). "If the defendant articulates a legitimate reason for the action, the presumption of discrimination raised by the *prima facie* case drops out, and the plaintiff has the opportunity to demonstrate that the proffered reason was not the true reason for the employment decision and that the plaintiff's membership in a protected class was." *Id.* (citing *McDonnell Douglas*, 411 U.S. at 804).

      i.   <u>Phases One and Two</u>

Defendants do not dispute that Plaintiff has established a *prima facie* case of sex discrimination (Def. Br. at 16), and the Court therefore considers such argument waived. *See Vasquez v. New York City Dep't of Educ.*, No. 11-CV-03674, 2015 WL 3619432, at *14 (S.D.N.Y. June 10, 2015), *aff'd*, 667 F. App'x 326 (2d Cir. 2016) ("Courts generally deem an argument waived or abandoned if a party fails to make it."). Likewise, Plaintiff, in her opposition brief, concentrates on her burden to establish that the reasons proffered by Defendants for her termination were pretextual, and does not appear to challenge that Defendants met their burden to articulate a legitimate reason for Plaintiff's termination. In any event, to be sure, the performance deficiencies cited by Defendants as the basis for the challenged discharge decision qualify as legitimate non-discriminatory and non-retaliatory reasons for taking an adverse employment action. *See, e.g.,*

*Gonzalez v. NYU Langone Hospitals*, No. 18-CV-01797, 2021 WL 4226042, at *7 (S.D.N.Y. Sept. 16, 2021). "As [d]efendant has provided a 'performance-based reason' for the decision to terminate [p]laintiff, it is 'relieved of any presumption of discrimination,' and the burden shifts back to [p]laintiff to demonstrate that [d]efendant's proffered reasons were a pretext for discrimination." *Barney v. H.E.L.P Homeless Service Corp.*, No. 19-CV-05959, 2021 WL 4267629, at *19 (S.D.N.Y. Sept. 20, 2021).

      ii.    <u>Phase Three: Pretext</u>

Phase three of the *McDonnell Douglas* burden shifting analysis requires Plaintiff "to demonstrate that the proffered reason was not the true reason for the employment decision and that the plaintiff's membership in a protected class was." *Wesley-Dickson*, 973 F. Supp. 2d at 397. This requires Plaintiff to "come forward with 'sufficient evidence to support a rational finding that the legitimate non-discriminatory reasons proffered by the [defendant] were false, and that more likely than not [discrimination] was the real reason for the [employment action].'" *Hartley*, 785 F. Supp. 2d at 180 (quoting *Weinstock v. Columbia Univ.*, 224 F.3d 33, 42 (2d Cir. 2000)); *see also Rajcoomar v. TJX Cos., Inc.*, 319 F. Supp. 2d 430, 438 (S.D.N.Y. 2004) ("The Supreme Court has articulated that 'a reason cannot be proved to be a pretext for discrimination' unless it is shown both that the reason was false, and that discrimination was the real reason.'" (quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506 (1993))).

To show pretext, "a plaintiff must submit admissible evidence showing circumstances to permit a rational finder of fact to find that the defendant's conduct was motivated in whole or in part by discrimination." *Rajcoomar*, 319 F. Supp. 2d at 438. The admissible evidence offered by a plaintiff must go beyond "self-serving and conclusory allegations that the defendants' proffered reasons were false." *Hartley*, 785 F. Supp. 2d at 180 (citing *Fletcher v. Atex, Inc.*, 68 F.3d 1451,

1456 (2d Cir. 1995)); *Alleyne v. Four Seasons Hotel*, No. 99-CV-03432, 2001 WL 135770, at *11 (S.D.N.Y. Feb. 15, 2001), *aff'd sub nom. Alleyne v. Four Seasons Hotel New York*, 25 F. App'x 74 (2d Cir. 2002) ("The plaintiff [ ] fails to offer any acts, statements, or admissions by a decision-maker to support her allegations of bias . . . and the plaintiff's conclusory and self-serving allegations that she was discriminated against are insufficient to demonstrate that [defendants'] nondiscriminatory reasons were a pretext for discrimination."). "Moreover, an employer's decisions are given deference by the court unless they are clearly pretextual." *Hartley*, 785 F. Supp. 2d at 180 (citing *Deabes v. Gen. Nutrition Corp.*, 415 Fed. App'x 334, 336 (2d Cir. 2011)).

"A showing that similarly situated employees belonging to a different [protected class] received more favorable treatment can also serve as evidence that the employer's proffered legitimate, non-discriminatory reason for the adverse job action was a pretext for . . . discrimination." *Graham v. Long Island R.R.*, 230 F.3d 34, 43 (2d Cir. 2000); *see also Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 108 (2d Cir. 2010) ("[T]he fact that other younger employees were not disciplined for violating numerous policies is both prima facie evidence of discrimination (i.e., it suggests that [Plaintiff] may have been treated differently from similarly situated coworkers), and evidence that the reasons given by [Defendant] for firing [Plaintiff] were pretextual."); *Villar v. City of New York*, 135 F. Supp. 3d 105, 125-26 (S.D.N.Y. 2015) ("Here, the stark contrast between the penalties administered to Plaintiff and the similarly situated male lieutenant for comparable conduct is strong evidence that Defendants' stated rationale is pretextual."). For comparators to be similarly situated, "a plaintiff must show those employees engaged in acts of comparable seriousness. A proposed comparator is not similarly situated unless she engaged in all of the same misconduct as plaintiff, or at least committed the most serious

infractions for which the plaintiff was subjected to an adverse employment action." *Hamilton v. DeGennaro*, No. 17-CV-07170, 2019 WL 6307200, at *11 (S.D.N.Y. Nov. 25, 2019).

Plaintiff argues that Orloski excused Donnelly's and Angulo's performance deficiencies after a single write-up against each, even though their Clubs were allegedly in no better shape than hers during the same time period. (Pl. Br. at 14-19). In other words, she identifies two male Club Manager comparators who received disciplinary write-ups for failing to execute company direction, like her, but who were not terminated, unlike her.

As regards Donnelly, the record reveals that after receiving a first warning, Donnelly implemented corrective measures (56.1 Stmt. ¶ 14; *see also* Donnelly Tr. at 19:10-13; 20:13-16; Wyatt Decl., Ex. 27), leading to Orloski's observation that Donnelly was having a "tremendous impact" and "turned things around very well." (Orloski Tr. at 167:6-15). With respect to Angulo, after the first write-up, Orloski visited the Middletown Club at least weekly (Angulo Tr. at 29:7-30:11; 35:10-25), at times providing Angulo additional feedback but finding no reason to issue further discipline (56.1 Stmt. ¶ 19). The record reveals that between June and December 2018, Orloski gave Angulo feedback similar to that set forth in his June 28, 2018 write-up, including that his Club was not sufficiently neat, clean and straight, he needed to be more aggressive in merchandising, and his sales metrics needed to improve. (Angulo Tr. at 38:4-42:21). Further, Plaintiff's November 3, 2018 visit to the Middletown Club demonstrates that Angulo's Club continued to exhibit deficiencies, as Angulo, Orloski and Clark agreed that those pictures depicted areas in need of improvement. (*Id*. at 52:13-22; Orloski Tr. at 286:22-287:24, 293:20-295:12; Clark Dep. at 312:8-314:6). Yet Angulo, unlike Plaintiff, was not written up again after his first on June 28, 2018. (56.1 Stmt. ¶ 19).

Plaintiff also cites data from the "Notes App," a means for managers and associates to take notes during club tours. (Pl. Br. at 5-6, 16-18). Plaintiff contends that the Notes App data for the Fishkill, Middletown, and Elmsford Clubs demonstrates that, between June 2018 and November 2018, Middletown and Elmsford were similar to Fishkill in terms of the proportion of uncompleted notes. (*Id*. at 5-6; Goldman Decl., Exs. 16, 17, 18). Plaintiff maintains that the uncompleted notes for Middletown and Elmsford during this time demonstrates that the "opportunities" or deficiencies sought to be remedied as indicated by the notes were not, in fact, remedied and, thus, remained as "opportunities" or deficiencies. (Pl. Br. at 5-6).

Defendants counter that the Notes App data does not demonstrate that Donnelly and Angulo are appropriate comparators because Orloski did not rely on the Notes App to confirm compliance with directives. (Defs. Br. at 19-20; Reply at 2-3). Defendants' argument concerning the use—or lack of use—of the Notes App does not definitively rebut Plaintiff's evidence.[4] A reasonable jury could find, regardless of the scope of the data in the Notes App, that Angulo and Donnelly—employees subject to the same performance evaluation and discipline standards as Plaintiff—exhibited the same types of performance deficiencies and lack of leadership and follow-through as that which formed the basis for Plaintiff's termination, yet were not terminated. Indeed, a simple review of the raw Notes App data itself confirms that Donnelly and Angulo are proper comparators. (*See* Goldman Decl., Exs. 16-18). Further, and again based on the raw data contained in the Notes App, a strong inference that the two males were treated differently than Plaintiff exists. "As a general rule, whether items are similarly situated is a factual issue that should be submitted to the jury." *Harlen Assocs. v. Inc. Vill. of Mineola*, 273 F.3d 494, 499 n.2 (2d Cir. 2001) (citing

---

[4] Whether the Notes App data was or was not relied upon by Orloski appears to be disputed, as Plaintiff points to Orloski's deposition testimony suggesting that he did in fact check to see if notes inputted into the app had been completed. (Orloski Tr. at 102; Goldman Decl., Ex. 3).

*Graham*, 230 F.3d at 39 ("Whether two employees are similarly situated ordinarily presents a question of fact for the jury.")). The ultimate conclusion here based upon this piece of evidence, like many of the others, is best left for the jury to decide.

Simply put, issues of fact exist as to whether Defendants' legitimate, non-discriminatory reason was simply pretext for sex discrimination. Such issues concern, for example, that after Plaintiff's termination, Defendants replaced her position with a male Club Manager; that two male Club Managers received written warnings for similar deficiencies as Plaintiff—and at least one continued to demonstrate deficiencies—but were not written up more than once each and were not terminated; as well as the comments of other female employees who noted their subjective belief that Orloski treated female employees differently from male employees. Considering these points in their totality—as the Court must, *see Weinstock*, 224 F.3d at 42—it is possible that a reasonable factfinder could conclude that Defendants' legitimate non-discriminatory reason for terminating Plaintiff was pretextual.

There is an assortment of admissible evidence here which the jury will need to weigh in order to determine whether a pretext exists or not in connection with Plaintiff's termination. The evidence herein is the type and caliber which makes a summary judgment analysis rejecting a pretext conclusion with certainty, as Defendants suggest, impossible to decide. The evidence adduced is well beyond the four corners of Plaintiff's mind; it is of the type a jury needs to hear. Genuine issues of material fact exist concerning this critical issue of pretext.

Defendants also argue that Orloski made the decision to promote Plaintiff to Club Manager a little more than a year before he, in consultation with Clark, made the decision to terminate Plaintiff's employment, which triggers a "same actor" inference that gender was not a factor in the decision-making calculus. "As the Second Circuit has recognized, 'some factors strongly suggest

that invidious discrimination was unlikely. For example, when the person who made the decision to fire was the same person who made the decision to hire, it is difficult to impute to her an invidious motivation that would be inconsistent with the decision to hire.'" *Villetti v. Guidepoint Global, LLC*, No. 18-CV-10200, 2021 WL 3550220, at \*3 (S.D.N.Y. Aug. 11, 2021) (quoting *Grady v. Affiliated Cent., Inc.*, 130 F.3d 553, 560 (2d Cir. 1997)). Plaintiff points out, however, that "[t]he same actor inference 'is generally not a sufficient basis to grant summary judgement for the employer, at least when the employee has proffered evidence of pretext.'" *Trostle v. State of New York*, No. 13-CV-00709, 2016 WL 1175215, at \*12 (N.D.N.Y. Mar. 24, 2016) (quoting *Masters v. F. W. Webb Co.*, No. 03-CV-06280, 2008 WL 4181724, at \*6 (W.D.N.Y. Sept. 8, 2008)). As Plaintiff has raised a genuine dispute of material fact regarding whether Defendants' proffered reason for her termination was pretextual, it would be inappropriate to dismiss at summary judgment Plaintiff's claims on the basis of the same-actor inference. Here too, the jury will need to consider this evidence as well.

Defendants' motion for summary judgment dismissing Plaintiff's first claim for relief is, accordingly, denied.

## II.   Title VII: Retaliation

Retaliation claims are likewise analyzed under the *McDonnell Douglas* framework, *Summa v. Hofstra Univ.*, 708 F.3d 115, 125 (2d Cir. 2013), and as with Plaintiff's disparate treatment claim, the parties, on this motion, concern themselves only with the third phase: pretext.

Unlike a claim of discriminatory discharge, a plaintiff alleging retaliation in violation of Title VII must show that retaliation was a 'but-for' cause of the adverse action, and not simply a 'substantial' or 'motivating' factor in the employer's decision." *Zann Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 845 (2d Cir. 2013); *see also Vega v. Hempstead Union Free Sch. Dist.*, 801

F.3d 72, 90-91 (2d Cir. 2015) ("It is not enough that retaliation was a 'substantial' or 'motivating' factor in the employer's decision."). "A plaintiff can demonstrate pretext 'by demonstrating weaknesses, implausibilities, inconsistencies, or contradictions in the employer's proffered reason, or by providing evidence such that a reasonable factfinder could conclude that the prohibited reason was a 'motivating factor' in the adverse employment action.'" *Amley v. Sumitomo Mitsui Banking Corp.*, No. 19-CV-03777, 2021 WL 4429784, at *16 (S.D.N.Y. Sept. 27, 2021) (quoting *Greenberg v. State Univ. Hosp. Downstate Med. Ctr.*, 838 F. App'x 603, 606 (2d Cir. 2020)). This standard does not require proof that retaliation was sole cause of the employer's action, as there may exist multiple "but-for" causes, each one of which may be sufficient to support liability. *Zann Kwan*, 737 F.3d at 846 n.5.

Temporal proximity alone is insufficient to defeat summary judgment at the pretext stage. *See El Sayed v. Hilton Hotels Corp.,* 627 F.3d 931, 933 (2d Cir. 2010). However, a plaintiff may rely on evidence comprising her *prima facie* case including temporal proximity, together with other evidence, to defeat summary judgment at that stage. *See Raniola v. Bratton*, 243 F.3d 610, 625 (2d Cir. 2001) ("Under some circumstances, retaliatory intent may . . . be shown, in conjunction with the plaintiff's prima facie case, by sufficient proof to rebut the employer's proffered reason for the termination.").

Defendants argue that because Orloski had already issued Plaintiff a third written warning for job performance by the time he learned of Plaintiff's second ethics complaint, no inference of retaliation can be drawn. "Where timing is the only basis for a claim of retaliation, and gradual adverse job actions began well before the plaintiff had ever engaged in any protected activity, an inference of retaliation does not arise." *Slattery v. Swiss Reinsurance Am. Corp.*, 248 F.3d 87, 95 (2d Cir. 2001). Plaintiff first engaged in protected activity on June 25, 2018, when she sent an

email to Clark accusing Orloski of not treating male and female Club Managers equally, which triggered an investigation into her complaint.  (56.1 Stmt. ¶ 21). Her first disciplinary write-up was, however, issued on or about June 15, 2018—prior to the first internal complaint of discrimination that she lodged. (*Id*. ¶ 16). Plaintiff received her second written action on June 23, 2018, again prior to any protected activity. (*Id*. ¶ 17). The investigation of her first internal complaint of discrimination closed on August 3, 2018 (*id*. ¶ 21); Orloski toured Plaintiff's Club twice in August (*id*. ¶¶ 22, 24) and, without knowledge that Plaintiff had initiated her second internal ethics complaint, issued Plaintiff a third written disciplinary action (*id*. ¶ 26); Plaintiff's second ethics investigation concluded on October 17, 2018 (*id*. ¶ 28); and Plaintiff was ultimately terminated on November 5, 2018 (*id*. ¶ 38).

The sequence of events here is unlike cases in which gradual adverse job actions began well before the protected activity. Prior to her first write-up on June 15, 2018, Plaintiff had an impeccable performance record. (Pl. CntrStmt. ¶¶ 8-12; Goldman Decl., Exs. 1, 2). The second write-up occurred only ten days after the first, and she initiated her first ethics complaint the same day as the second write-up. "It would be illogical to penalize Plaintiff for failing to complain of the discriminatory nature of that action before it had even taken place." *Pacheco v. Comprehensive Pharmacy Servs.*, No. 12-CV-01606, 2013 WL 6087382, at *13 (S.D.N.Y. Nov. 19, 2013). As Plaintiff's third write-up occurred approximately two months after her first internal complaint and her termination occurred approximately two months after that, the timing supports an inference of retaliation. *See, e.g., Summa*, 708 F.3d at 128. Viewing the evidence in the light most favorable to Plaintiff, as required on a motion for summary judgment, Plaintiff has, in addition to establishing temporal proximity, offered evidence of disparate treatment—evidence from which a reasonable

jury could infer that the reasons proffered by Defendants were a pretext for a retaliatory motivation.

The determination of whether retaliation was a "but-for" cause, rather than just a motivating factor, is particularly poorly suited to disposition by a summary judgment motion here, because it requires weighing of disputed facts, rather than a determination that there is no genuine dispute as to any material fact. It is for a jury to decide whether Plaintiff would not have been terminated but for her internal discrimination complaints. Accordingly, the Court denies Defendants' motion for summary judgment on Plaintiff's Title VII retaliation claim against Defendants.

### III.   NYSHRL Claims

Plaintiff also asserts state law sex discrimination and retaliation claims under the NYSHRL. These claims under the NYSHRL are generally governed by the same standards as federal claims under Title VII. *Schiano v. Quality Payroll Sys., Inc.*, 445 F.3d 597, 609 (2d Cir. 2006) (citing S*mith v. Xerox Corp.*, 196 F.3d 358, 363 n.1 (2d Cir. 1999)); *see also Mandell v. Cty. of Suffolk*, 316 F.3d 368, 377 (2d Cir. 2003) ("We will for purposes of this opinion assume that the standards of proof applicable to plaintiff's Title VII and Human Rights Law claims are the same in all relevant respects."). Several amendments to the NYSHRL, "the effect of which is to render the standard for claims closer to the standard of the [New York City Human Rights Law] . . . . only apply to claims that accrue on or after the effective date of October 11, 2019; they do not apply retroactively to Plaintiff's claims here. *Livingston v. City of New York*, 563 F. Supp. 3d 201, 233 (S.D.N.Y. 2021). Thus, for the same reasons that the Court found issues of fact as to Plaintiff's Title VII claims against Defendants, the Court finds issues of fact as to Plaintiff's NYSHRL claims against Defendants.

## **CONCLUSION**

For the foregoing reasons, Defendants' motion for summary judgment is DENIED. Plaintiff's claims will proceed to trial. The parties are directed to meet and confer and comply with the Court's Individual Practices (rev. May 2, 2022) Rules 6(A) and 6(B) by filing the documents required therein, which include a joint pretrial order, proposed joint *voir dire* questions, joint requests to charge, joint verdict form, and motions *in limine*, on or before September 23, 2022.

A pretrial conference has been scheduled for October 13, 2022 at 3:30 p.m. to be held in Courtroom 520 of the courthouse located at 300 Quarropas Street, White Plains, New York 10601.

The Clerk of Court is respectfully requested to terminate the pending motion (Doc. 56).

SO ORDERED:

Dated: White Plains, New York
      August 2, 2022

_____
Philip M. Halpern
United States District Judge